IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARC BOYD,

       Plaintiff,

  v.

OREGON STATE POLICE LIEUTENANT
ROBERT EDWARDS; OREGON STATE
POLICE CAPTAIN ANDY HEIDER;
OREGON STATE POLICE LIEUTENANT
DAVID GIFFORD; AND OREGON STATE
POLICE CAPTAIN JEFF LANZ;

       Defendants.

Case No. 6:15-cv-238-MC

OPINION AND ORDER

MCSHANE, Judge:

      Plaintiff Marc Boyd brings this action against four Oregon State Police ("OSP") officers, alleging the officers violated his procedural due process and First Amendment rights. One year ago I dismissed the First Amendment claims against Lieutenant Edwards, Captain Heider, and Captain Lanz. Those claims were based on alleged retaliation against Boyd following Boyd's reporting of an alleged unconstitutional search by Lieutenant Edwards. I denied in part Boyd's First Amendment claim against Lieutenant Gifford. Boyd based that claim on a speech Lieutenant Gifford gave to other officers in retaliation for Boyd filing either a tort claims notice or this action. I concluded that although Boyd's filing of a tort claims notice was not protected

1 – OPINION AND ORDER

speech, the filing of the complaint was protected. The remaining claims are Boyd's First Amendment claim against Lieutenant Gifford and procedural due process claims against the other defendants. Because defendants did not violate Boyd's rights to due process or his rights under the First Amendment, defendants' motion for summary judgment, ECF No. 44, is GRANTED.

## BACKGROUND

As the parties are well aware of the facts, and because many of the alleged bad acts relate to the dismissed claims, I include only a limited factual background in this opinion.

For his procedural due process claims, Boyd generally claims Lieutenant Edwards, Captain Heider, and Captain Lanz violated his due process rights during the course of several disciplinary investigations. In his deposition, Boyd was unable to identify any alleged process he was entitled to that he did not receive. In his response to defendants' motion for summary judgment, Boyd attempts to remedy this shortcoming by pointing to a few internal emails that he learned of during discovery in this action. Boyd argues that by not disclosing those emails during the investigation, defendants violated his right to due process.

The first email is dated August 6, 2013 and is from Lieutenant Edwards to Captain Letz and Captain Helder. Boyd Decl. Ex. 3. Edwards wrote:

> Captain Lanz
>
> Hopefully I'm wrong but I have a suspicion that Marc Boyd and/or [redacted] will eventually file some sort of hostile work environment complaint in the not too distant future.
>
> Boyd is still telling anyone who will listen how much stress the ongoing investigations are causing him. He went to the Doctor and his BP is through the roof and his Dr. wants him to take meds. He's struggling with the new NICHE

system and bitches about it often. He is now being alienated by some co-workers due to this constant drama and negativity.

He tells people the department is out to get him for being a whistle blower and is being treated differently than the other troops.

[Redacted] and Marc hang out together a lot. I'm sure the two spend a lot of time gripping to one another about how bad they feel the department is treating them and if only they were in charge the department would be a better agency. I would not be surprised if they teamed up in an attempt to make themselves look like victims in an effort to support a BS claim.

Just my two cents worth.

Rob.

*Id.*

On October 19, 2013, the Eugene Police Department ("EPD") arrested Boyd at a University of Oregon football game. The incident at the football game led to an internal investigation. Although Boyd was investigated for other incidents, Boyd focuses his procedural due process claim on the investigation of the football game incident.

The second email of concern is an email from EPD officer Scott Fellman to defendant Edwards and three other individuals. Boyd Decl. Ex. 8. Fellman wrote:

Lt. Edwards,

Attached is the requested memo documenting EPD Officer Jed McGuire's contact with off duty Trooper Marc Boyd at last Saturday's UO football game. When I responded to the scene Trooper Boyd was polite and cooperative. Mr. and Mrs. Boyd requested that if Marc was being ejected, he be sent out the north gate so his child wouldn't see him being led out of the stadium. I escorted Marc, un-handcuffed, to the north gate for ejection and explained that he could not return to the game tonight or he would face trespass charges but that he was entitled to attend future games.

While walking to the gate, Marc told me the following: Officer McGuire's initial contact with him in the stands was to poke him and tell him to "get the fuck up." When the officer asked for ID, he told Mark "give me your fucking ID". When

3 – OPINION AND ORDER

> Marc asked McGuire for his name his only response was to flash his name tag too quickly for Marc to read it. Marc denied resisting the officers when he was handcuffed. Marc also said the officers had no legal justification for detaining him.
>
> I have not shared the details of what Marc told me with any of the involved officers. I confirmed with Ofc. McGuire that Marc was searched for weapons after being handcuffed and was not found to be in possession of any firearms.
>
> Please let me know if I can be of any further assistance. The other involved officers are listed in McGuire's memo.
>
> Thank you,
>
> Scott.

*Id.*

A third email, also dated October 21, 2013, is an email from Lieutenant Edwards forwarding Officer Fellman's email (above) to Captain Heider, Captain Lanz, Lieutenant Theresa Bloom, and three other individuals at OSP. Boyd Decl. Ex. 1. Lieutenant Bloom ultimately conducted the investigation regarding Boyd's conduct at the football game. Edwards wrote:

> After reading the report it's very apparent Officer McGuire told Marc he was under arrest and after a struggle placed him into custody for Disorderly Conduct, Interfering with Police and Resisting Arrest. I can see how the Disorderly charge went away after the victim refused to prosecution but the Interfering and Resisting Arrest???? Not sure why they released him based on the information within this report. I made it crystal clear to Capt. Fellman that Marc needed to be treated no differently than any of the other 57,000 people at the stadium.
>
> His actions were obviously criminal in nature or they would not have told him he was under arrest and put handcuffs on him.
>
> Based on the below e-mail it looks like Marc once again won't accept any responsibility and is blaming the incident on Officer McGuire.
>
> What do you think?

4 – OPINION AND ORDER

> Rob

*Id.*

A fourth email is a November 14, 2013 email from Lieutenant Edwards to Captain Helder and Lieutenant Bloom. Edwards wrote:

> Was the Lane County DDA reviewing Marc's case Amy Seeley???? If so I'm 90% sure there is a conflict of interest. Spoke with Ashenfelter today and was at the DA's office on a separate matter and suddenly recalled some stuff. I think Amy is married to Jay Hall who is also a DDA at Lane Co. Marc and Jay are real tight and Marc has had dinner with and spends off duty time with Amy and Jay. If it was Amy she likely should have asked for it to be given to a different DDA for review. Might be better if Douglass or Linn County reviews it. Might be too late for that.
>
> Thanks
>
> Rob

Boyd Decl. Ex. 2.

A fifth email is an October 20, 2014 email from Lieutenant Edwards to Captain Helder and two other individuals at OSP:

> Just a heads up.
>
> I received a text from Marc Boyd last night 10-18-14 at 9:13pm. It read "Just A heads up your pov tags are expired"
>
> I replied "Tahoe or accura" and he replied "Tahoe" I replied "Thanks for the info Obviously I hadn't noticed"
>
> Marc lives in east Springfield and I live in northwest Eugene, the total opposite ends of town. My Tahoe is parked on the street in front of my house and my tags did expire Sept 30.... This is the first communication I have had with Marc in 7 months. I don't think his text was meant to be a friendly FYI.... And why is he checking out my license plates at 9:00pm at night? Just want you to know in case I get whacked, my Tahoe explodes or the brake lines are cut and it lead me or my wife to a fiery crash.

5 – OPINION AND ORDER

> Not sure if you two were aware but very shortly after Jeff's incident hit the media[1] I received a letter postmarked from Eugene. The letter was short and stated "Lt. Rob Edwards, in light of the Captain Lanz issue. A word of advise...remember Karma can be a real Bitch! X."
>
> I'm not scared but in light of all the drama involving Marc the past 20 months it's a bit creepy. I feel it's his attempt to convey a touch of fear or concern into my life.
>
> Again FYI only.
>
> Rob.

Boyd Decl. Ex. 4.

After the incident at the football game, Boyd was placed on paid administrative leave pending the outcome of an internal investigation. Lieutenant Edwards and Captain Heider gave Boyd a letter announcing the intention of terminating Boyd based upon the results of the investigation. Through his union attorneys, Boyd challenged the discipline. The discipline was eventually reduced to a one month pay reduction.[2] Specifically, Boyd received a one-month, one-step economic sanction. Schoorl Decl. ¶ 2. Boyd's total wage loss resulting from the sanction came to $149.46. Schoorl Decl. ¶ 5. After administrative and medical leave, Boyd returned to his old position. Boyd admits he has been treated well since his return to work.

On June 6, 2014, before returning to work, Boyd filed his tort claims notice. Six months later, on January 16, 2015, Lieutenant Gifford made a speech to other officers, the essence of which was that Boyd was toxic. On February 12, 2015, before returning to work, Boyd filed this

---

[1] Captain Lanz, charged with heading the OSP's Office of Professional Standards, was fired after pleading guilty to charges stemming from Lanz's misuse of a state-issued fuel card.

[2] As noted, Boyd relies largely on alleged inadequacies during the investigation of the incident at the football game. Although Boyd was the subject of other investigations, those investigations did not result in any economic sanctions. At least one investigation cleared the charges against Boyd. The other investigations resulted in verbal or written discipline.

action. Boyd's First Amendment claim against Lieutenant Gifford stems solely from Gifford's January 16, 2015 speech.

## STANDARDS

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

**I. Boyd's Due Process Claims against Lieutenant Edwards, Captain Heder, and Captain Lanz**

To prevail on these claims, Boyd must establish: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations omitted).

7 – OPINION AND ORDER

Due process rights are flexible, depending largely on the specific factual circumstances along with a weighing of the governmental and private interests involved. *Mathews*, 424 U.S. at 334 (internal citations omitted); *Mullane v. Central Hannover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (due process tolerates variances in procedure "appropriate to the nature of the case."). Each setting invites its own assessment under a *Mathews* analysis and the only general statement that can be made is that persons holding interests protected by the due process clause are entitled to "some kind of a hearing." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted).

Courts look at three factors when considering the sufficiency of the administrative procedures provided: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S at 335.

In *Loudermill*, the Supreme Court addressed "what pretermination process must be accorded a public employee who can be discharged only for cause." 470 U.S. at 535. The court described the competing interests at stake as "private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." *Id.* at 542-43.

The *Loudermill* Court confirmed that "the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against the mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that

the charges against the employee are true and support the proposed action." *Id.* at 545-46. Under any application of *Loudermill*, Boyd's procedural due process claims are meritless.[3]

All of the investigations of Mr. Boyd's activities by his employer were supported by reasonable grounds. The warehouse investigation stemmed from a complaint from the landowner. The investigation regarding the bow hunting incident resulted from a complaint from the owner of the bow. The investigation surrounding the football game resulted from a very public incident ending with Boyd being handcuffed and then escorted out of the game. These were not investigations manufactured by the defendants.

More important to Boyd's due process claims, however, is the fact that Boyd received far more process than required under the Constitution. "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* at 546 (internal citations omitted).

Boyd received all of the above and more in the context of each investigation. He was allowed more than a chance to simply present his side of the story. He was represented by union attorneys. Twice he proceeded to arbitration. He had an opportunity to appeal the decisions and his success in his appeals ultimately led to less discipline. To the extent Boyd argues that the investigations simply 'got it wrong,' that argument fails. "The Due Process Clause of the

---

[3] "The nature of the deprivation Plaintiff suffered determines how much process she is due." *Ganley v. Cnty. of San Mateo*, 2007 WL 4554318 at *5 (N.D. Cal. Dec. 20, 2007). Of course the loss of one's job is a more severe deprivation than a loss of $150. As Boyd's liberty interest did not approach that suffered by the plaintiff in *Loudermill*, Boyd was in fact entitled to much less procedural protections than those set forth there. Because it is clear Boyd received much more process than required under the Constitution, I use the *Loudermill* standards here.

9 – OPINION AND ORDER

Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 350 (1976).

Boyd's arguments regarding the emails are on even shakier ground. First, Edwards's emails are, at best, tangential to any investigation of Boyd. And Officer Fellman's email, which Boyd argues proves his innocence, was forwarded to Lieutenant Bloom, who conducted the investigation. Lieutenant Edwards in fact forwarded Officer Fellman's email to Lietenant Bloom on October 21, 2013, the same day Officer Fellman sent it to Lieutenant Edwards. Boyd Decl. Ex. 1.

There is no evidence in the record that Lieutenant Bloom conducted anything other than a full, fair, and impartial investigation. Lieutenant Bloom, not any of the named defendants, conducted the investigation. Bloom Decl. ¶ 2. Bloom included all facts and documents she considered material. Bloom Decl. ¶ 3. Before interviewing Boyd, Bloom provided Boyd with copies of the documents she collected. Bloom Decl. ¶ 4. Bloom made her own decisions on what to include, without input from anyone else, based on her understanding of the collective bargaining agreement. Bloom Decl. ¶ 5.

Lieutenant Bloom wrote a 49-page investigation. Bloom interviewed everyone involved in the incident. In addition to interviewing all of the officers, Bloom interviewed several crowd management individuals working at the stadium. Bloom interviewed Boyd, his wife, and two other witnesses Boyd asked Bloom to speak to. Three days before interviewing Boyd, Bloom dropped off a 24 hour notice and "all the documents collected to date" at the union office. Bloom's write up of Boyd's interview alone spans six full pages. The union president and two union attorneys were present for Bloom's interview of Boyd. In short, Boyd received an abundance of process.

10 – OPINION AND ORDER

Further, OSP Lieutenant Douglass Ladd, who is not a party to this action, wrote the Findings of Fact for the case involving Boyd's ejection from the football game. Ladd Decl. ¶ 2. Ladd based his findings on the investigative report prepared by Bloom and did not perform an additional investigation. Ladd Decl. ¶ 3. Ladd made his own decisions, without input from anyone else, regarding the findings. Ladd Decl. ¶ 4.

As Boyd admitted at oral argument, he essentially makes a *Brady* argument in support of his due process claim. Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government is required to disclose any exculpatory evidence to a criminal defendant. While criminal defendants are certainly entitled to exculpatory materials, this case involves a workplace disciplinary proceeding, not a criminal proceeding. *Brady* is not applicable here.

## II. Boyd's First Amendment Claim against Lieutenant Gifford

A government employee alleging that his employer violated his right to free speech must satisfy five elements:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013) (en banc) (citation omitted).

In my Opinion and Order on defendants' motion to dismiss, I concluded that as "an initial matter, Boyd's tort claims notice is not a matter of public concern, so it does not qualify as protected First Amendment speech. . . . The tort claims notice is merely a statutory procedural requirement Boyd had to follow in order to sue the government and is of no interest to the

11 – OPINION AND ORDER

general public." May 27, 2015 Opinion, 9-10. I issued that opinion nearly one year ago, before the parties engaged in discovery. Now, on the eve of trial, Boyd essentially asks me to revisit that opinion. For multiple reasons, I decline to do so.

First, despite argument from Boyd's attorney, there is no evidence in this record indicating Boyd's filing of the tort claims notice was anything other than a mere statutory procedural requirement he had to follow. There is no evidence the public had any knowledge Boyd filed such a notice. Boyd presented no evidence that the tort claims notice in this instance was a matter of public concern.

Second, the parties have approached discovery in this case with the assumption that Boyd's act of filing this action was the only protected speech at issue. Revisiting my earlier conclusion at this late date would severely prejudice Lieutenant Gifford. If Boyd wanted to revisit my earlier conclusion, the time to do so passed many months ago.

Finally, even assuming Boyd is correct that his filing of a tort claims notice here was protected speech, Lieutenant Gifford is entitled to qualified immunity. "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dunn v. Castro*, 621 F.3d 1196, 1198-99 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining if an official is entitled to qualified immunity, courts look at two issues: (1) whether the plaintiff alleged facts establishing the violation of a constitutional right; and (2) "whether the right is clearly established such that a reasonable government official would have known that 'his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 121 (2001)). While the first prong is a factual inquiry, the second prong is a question of law.

12 – OPINION AND ORDER

*Id.* Courts must determine whether "the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful. *Dunn*, 621 F.3d at at 1200 (quoting *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003)).

As I concluded in my earlier opinion, Boyd's filing of this lawsuit is certainly a matter of public concern. *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926 (9th Cir. 2004) ("when government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees . . . their speech is inherently a matter of public concern. . . . Litigation seeking to expose such wrongful governmental activity is, by its very nature, a matter of public concern.") (internal citations omitted). However, as discussed at oral argument, whether a tort claim notice can support a First Amendment claim is far from a well-settled issue in the Ninth Circuit. Thus, Lieutenant Gifford lacked fair warning that his comments to other officers, made before Boyd filed this action, may have violated Boyd's First Amendment rights. Therefore, Lieutenant Gifford is entitled to qualified immunity.

The record is clear that Lieutenant Gifford's comments to other officers regarding Boyd's toxicity occurred prior to the filing of this action. As a result, Boyd cannot claim that his First Amendment rights were violated by Gifford in retaliation for his claims against the state police.

## CONCLUSION

Defendants' motion for summary judgment, ECF No. 44, is GRANTED.

IT IS SO ORDERED.

DATED this 4th day of May, 2016.

                                                                                          /s/ Michael J. McShane  
                                                                                          Michael McShane  
                                                                       United States District Judge